**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH M. CAFFARELLO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13 C 8495 |
| | ) | |
| ILLINOIS STATE TOLL HIGHWAY | ) | |
| AUTHORITY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On November 25, 2013, Plaintiff Joseph M. Caffarello brought the present nine-count Complaint against Defendants Illinois State Toll Highway Authority ("Toll Authority"), Office of the Inspector General of the Toll Authority ("OIG"), James Wagner, individually and in his official capacity as Inspector General of the Toll Authority ("Wagner"), and Rita Mayfield, individually and in her official capacity as Illinois State Representative of Illinois House District 60 ("Representative Mayfield"). Before the Court are Defendants' motions to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6).

For the following reasons, the Court grants Defendants' motions as to Counts II, III, VI, VII, VIII, and IX of the Complaint with prejudice and dismisses Representative Mayfield as a Defendant to this lawsuit. The Court grants Defendants' motion to dismiss Count IV without prejudice and further grants Plaintiff leave to amend his procedural due process claim with respect to his liberty interest, as discussed in detail below. Also, the Court grants in part Defendants' motion to dismiss Count I regarding Wagner's October 23, 2012, memorandum to the Toll Authority, but denies the remainder of Defendants' motion to dismiss Count I. The

Court denies Defendants' motion to dismiss Count V of the Complaint.  Plaintiff's Amended

Complaint is due on or before August 5, 2014.

## LEGAL STANDARD

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief

may be granted."  *Richards v. Mitcheff,* 696 F.3d 635, 637 (7th Cir. 2012).  Under Rule 8(a)(2), a

complaint must include "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The short and plain statement under Rule 8(a)(2)

must "give the defendant fair notice of what the claim is and the grounds upon which it rests."

*Bell Atlantic v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (citation

omitted).  Under the federal notice pleading standards, a plaintiff's "factual allegations must be

enough to raise a right to relief above the speculative level."  *Twombly,* 550 U.S. at 555.  Put

differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937,

1949, 173 L. Ed. 2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).  "In reviewing the

sufficiency of a complaint under the plausibility standard, [courts] accept the well-pleaded facts

in the complaint as true, *Alam v. Miller Brewing Co.,* 709 F.3d 662, 665-66 (7th Cir. 2013), and

draw "reasonable inferences in favor of the plaintiffs."  *Teamsters Local Union No. 705 v.*

*Burlington No. Santa Fe, LLC,* 741 F.3d 819, 823 (7th Cir. 2014).

## BACKGROUND

The Toll Authority is an administrative agency of the State of Illinois and is in charge of

the administration and maintenance of Illinois toll roads.  (R. 1, Compl. ¶ 3.)  The OIG was

created to maintain the public trust in the administration and operation of the Toll Authority.

(*Id*. ¶ 4.)  Wagner is the Toll Authority Inspector General.  (*Id*. ¶ 5.)  Plaintiff alleges that the Toll Authority and OIG empower Wagner, as the Toll Authority Inspector General, to investigate waste, inefficiencies, fraud, corruption, and mismanagement in the day-to-day operations of the Toll Authority.  (*Id*. ¶ 9.)  Plaintiff further alleges that at all relevant times he was working under the authority and control of Wagner, who had the authority and responsibility for all employment decisions and policies concerning the terms and benefits of Plaintiff's employment.  (*Id*.)

Plaintiff began his employment with the Toll Authority in April 2000 as a seasonal toll collector, and in June 2000, he became a full-time toll collector and a member of a bargaining unit.  (*Id*. ¶¶ 11, 12.)  In November 12, 2002, Plaintiff became an Equipment Operator/Laborer for the Toll Authority.  (*Id*. ¶ 14.)  In December 2010, the Toll Authority promoted Plaintiff to Roadway Section Supervisor.  (*Id*. ¶ 16.)  After his December 2010 promotion, the Toll Authority assigned Plaintiff to its Maintenance 6 operation in Marengo, Illinois ("M-6").  (*Id*. ¶ 17.)  Beginning in May 2011, the Toll Authority temporarily reassigned Plaintiff to Roadway Section at M-4 in Gurnee, Illinois.  (*Id*. ¶ 18.)  On July 1, 2011, the Toll Authority officially transferred Plaintiff to M-4.  (*Id*.)

Upon Plaintiff's arrival at M-4, and in his capacity as Roadway Section Manager, Plaintiff identified a number of operational and personnel issues that he believed had a negative impact on the safety of M-4 roadway personnel and the motoring public.  (*Id*. ¶ 19.)  Plaintiff further alleges that he insisted that M-4 employees put in an honest day's work and that they contribute to the Toll Authority's success and growth.  (*Id*.)  As a result of his actions, Plaintiff asserts that he "ruffled the feathers" of some M-4 employees.  (*Id*. ¶ 20.)  One of these

disgruntled employees was Edward Maluska. (*Id.* ¶¶ 21, 23.)

Plaintiff further contends that Maluska used his clout with Defendant Representative Mayfield, after which she called Plaintiff telling him that she looks out for Maluska because he is her constituent. (*Id.* ¶ 26.) According to Plaintiff, Representative Mayfield told him that Maluska complained about his fellow co-workers harassing him and that she wanted Plaintiff to put a stop to the harassment. (*Id.* ¶ 27.) Plaintiff told Representative Mayfield that it was inappropriate for her to contact him about disciplining Toll Authority employees and stated that he takes direction from Roadway Maintenance Manager Michael Zadel. (*Id.* ¶ 28.) Plaintiff then gave Zadel's contact information to Representative Mayfield and she contacted Zadel a few minutes later. (*Id.*)

After his telephone conversation with Representative Mayfield, Plaintiff met with Maluska on August 31, 2011, at which time Maluska acknowledged that he was aware of Plaintiff's and Representative Mayfield's earlier telephone conversation. (*Id.* ¶ 29.) Plaintiff alleges that during the meeting, Maluska made threats about his co-worker John Misek because Misek allegedly defiled a photograph of Maluska's father. (*Id.*) On September 1, 2011, Plaintiff sent Zadel and the district manager an e-mail detailing his August 31, 2011, telephone conversation with Representative Mayfield, the conflict between Maluska and his co-workers Misek and Joseph Genella, and Maluska's threat to get back at his co-worker. (*Id.* ¶ 30.) Plaintiff's e-mail stated that he intended to make a recommendation to move Maluska to a shift that would not require him to work with Misek or Genella. (*Id.*) According to Plaintiff, Maluska was not pleased with the shift change because he would face more scrutiny. (*Id.* ¶ 32.)

In March 2012, the General Manager of Maintenance and Traffic told Plaintiff that the

4

Toll Authority had received a photograph of him sleeping on the job. (*Id*. ¶ 33.) Plaintiff alleges that Representative Mayfield provided the photograph of him to the Toll Authority in a May 12, 2012 letter authored by her entitled "waste of taxpayer dollars." (*Id*. ¶ 34.) In particular, Representative Mayfield sent the letter to the Executive Inspector General with copies to the Illinois Governor, Executive Director of the Toll Authority, and the Chair of the Toll Authority's Board. (*Id*.) On April 2, 2012, the Toll Authority issued Plaintiff a written reprimand and a two-day unpaid suspension for sleeping on the job, after which Plaintiff served the suspension. (*Id*. ¶¶ 37, 38.)

Plaintiff further alleges that Wagner initiated an investigation into his misconduct on or about March 27, 2012, that Representative Mayfield's March 12, 2012 letter had triggered. (*Id*. ¶ 42.) On April 14, 2012, Plaintiff met with Wagner and an investigator from OIG. (*Id*. ¶ 46.) According to Plaintiff, Wagner asked him about his work history with the Toll Authority and how he got promoted so rapidly. (*Id*.) Wagner also asked Plaintiff about whether he knew certain Italian individuals who were in prison and then asked Plaintiff if he was involved in bookmaking or if he gambled. (*Id*.) Plaintiff's national origin is Italian. (*Id*. ¶¶ 47, 48.)

After the investigation into Plaintiff's conduct, on October 23, 2012, Wagner drafted a memorandum recommending that the Toll Authority terminate Plaintiff's employment based on his misconduct. (*Id*. ¶ 60.) On November 26, 2012, the Toll Authority suspended Plaintiff without pay for unprofessional behavior in connection with his subordinate staff. (*Id.* ¶¶ 64, 65.) Plaintiff alleges that his changing Maluska's shift was a factor in his suspension. (*Id*. ¶ 65.) On December 3, 2012, Plaintiff filed an appeal of the November 26, 2012, suspension without pay with his supervisor, Roadway Maintenance Manager Zadel, pursuant to the Tollway Policy and

Procedures Manual, Section E that states suspension without pay is appropriate when a reprimand is unsuccessful or when the gravity of an offense so warrants. (*Id*. ¶¶ 66, 81.) Section E also requires that the Toll Authority provide a copy of the documentation to the disciplined employee. (*Id*.) In his December 3, 2012 appeal, Plaintiff also cited Section F, which requires a Department Chief to approve suspensions. (*Id*. ¶ 66.) Plaintiff further alleges that Zadel did not respond to this appeal. (*Id*. ¶ 81.)

At the end of January 2013, the Toll Authority forwarded Plaintiff a letter including an OIG Executive Memorandum dated January 30, 2013, a one page *Loudermill* response form, and information about unemployment insurance. (*Id*. ¶ 88.) The January 2013 letter further advised Plaintiff that he had seven business days to respond. (*Id* ¶ 89.) On February 11, 2013, Plaintiff timely denied the charges against him. (*Id*. ¶ 99.) By letter dated February 20, 2013, the Chief of Administration informed Plaintiff that the Toll Authority was terminating his employment. (*Id*. ¶ 101.)

On March 28, 2013, the Toll Authority placed on its website a summary activity report entitled "Illinois Tollway Inspector General Releases Summary Activity Report for Past Six Months." (*Id*. ¶ 103.) The report stated that the Toll Authority had terminated the employment of a Toll Authority Maintenance Supervisor because he was found sleeping on the job and had intimidated employees. (*Id*.) On that same day, the Toll Authority Defendants placed on the website a similar summary activity report that stated that OIG initiated an investigation into a Maintenance Supervisor on March 27, 2012, "following receipt of information from an elected official, regarding allegations of the Supervisor sleeping on the job and intimidating employees." (*Id*. ¶ 104.) The reports did not mention Plaintiff by name. (*Id*. ¶¶ 103-04.) On April 19, 2013,

the Toll Authority Defendants published redacted copies of the January 30, 2013 OIG Executive Memorandum and Plaintiff's February 11, 2013 response on the Toll Authority's website.  (*Id.* ¶ 119.)   Plaintiff alleges that these documents made false statements.  (*Id*. ¶ 120.)

In his Complaint, Plaintiff alleges the following claims:  (1) an Equal Protection national origin discrimination claim (Count I); (2) First Amendment political affiliation and speech claims (Counts II and III); (3) a Fourteenth Amendment procedural due process claim (Count IV); (4) a conspiracy claim under 42 U.S.C. § 1983 (Count V); (5) a state law tortious interference with employment expectancy claim (Count VI); (6) a state law defamation claim (Count VII); (7) a state law invasion of privacy claim (Count VIII); and (8) a whistleblower claim under the Illinois State Officials and Employees Ethics Act, 5 ILCS 430/1, *et seq*. (Count IX).

## ANALYSIS

## I.    National Origin Discrimination Claim — Count I

In Count I of his Complaint, Plaintiff brings a Fourteenth Amendment equal protection claim based on his national origin against Defendants Toll Authority, OIG, and Wagner pursuant to 42 U.S.C. § 1983.  "To establish a violation of the Fourteenth Amendment's Equal Protection Clause, a plaintiff must demonstrate that a 'state actor has treated him differently from persons [not in his protected class] and that the actor did so purposefully.'"  *Xiong v. Wagner,* 700 F.3d 282, 295 (7th Cir. 2012) (citation omitted); *see also Swanson v. City of Chetek,* 719 F.3d 780, 783 (7th Cir. 2013) ("The typical equal protection case involves discrimination by race, national origin or sex.").  In support of his equal protection claim, Plaintiff alleges that Wagner, who had the authority to investigate corruption within the Toll Authority, was aware of Plaintiff's Italian

heritage. (Compl. ¶¶ 9, 46.) Plaintiff further contends that Wagner was suspicious how Plaintiff was promoted "so rapidly" and asked Plaintiff if he gambled or was involved in bookmaking. (*Id*. ¶ 46.) In addition, Plaintiff contends that Wagner's October 23, 2012, memorandum to the Toll Authority recommending Plaintiff's termination was based on his Italian heritage. (*Id.* ¶¶ 46, 60.)

Defendants argue that the *Noerr-Pennington* doctrine immunizes them against Plaintiff's national origin discrimination claim because Wagner's October 23, 2012, memorandum constitutes "petitioning" under the First Amendment. Originally, the *Noerr-Pennington* doctrine carved out immunity from antitrust liability for certain types of petitioning activities, including those deemed anti-competitive. *See United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669 (1965); *E.R.R. Presidents Conference v. Noerr Motor Freight*, Inc., 365 U.S. 127, 139-40 (1961). Over time, however, the *Noerr-Pennington* doctrine has been "extended beyond the antitrust laws, where it originated, and is today understood as an application of the first amendment's speech and petitioning clauses." *New West, L.P. v. City of Joliet*, 491 F.3d 717, 722 (7th Cir. 2007). In general, the "doctrine protects litigation, lobbying, and speech" and applies to governmental activities. *Id.* Also, immunity under the *Noerr–Pennington* doctrine applies "regardless of intent or purpose." *Pennington*, 381 U.S. at 670.

Based on the Seventh Circuit's broad definition of "petitioning," Wagner's October 23, 2012, memorandum to the Toll Authority recommending Plaintiff's termination is immunized under the *Noerr-Pennington* doctrine because Wagner was petitioning the Toll Authority for an official action when he recommended Plaintiff's termination. *See Tarpley v. Keistler,* 188 F.3d 788, 794 (7th Cir. 1999); *see, e.g., Irmer v. Reinsdorf,* No. 13 C 2834, 2014 WL 2781833, at *6

(N.D. Ill. June 19, 2014).

Although Wagner's October 23, 2012, memorandum to the Toll Authority falls under the *Noerr-Pennington* doctrine, Plaintiff's equal protection national origin claim encompasses more than just Wagner's official memorandum. Plaintiff, for example, alleges that Wagner encouraged Maluska and other M-4 employees to make false accusations of impropriety against him. (Compl. ¶ 55.) Further, Plaintiff alleges that Wagner and others at the Toll Authority falsely reported that he needed to be drug tested in June 2012 after he was found sleeping at his desk. (*Id.* ¶ 56.) Plaintiff thus maintains that not all of Wagner's conduct underlying his national origin claim is immunized. The Court agrees. Viewing these allegations as true, Wagner's additional conduct is outside of *Noerr-Pennington's* reach because Wagner was not seeking governmental action. *See Mercatus Group, LLC v. Lake Forest Hosp.,* 641 F.3d 834, 850 (7th Cir. 2011).

Last, Defendants' argument that Plaintiff has failed to sufficiently allege his equal protection claim under the federal pleading standards is unavailing because Plaintiff has alleged enough details that Wagner terminated his employment based on Plaintiff's national origin to present "a story that holds together." *See Engel v. Buchan,* 710 F.3d 698, 709 (7th Cir. 2013). Indeed, the proper question at this procedural posture is could these things have happened, not did they happen. *See id.*; *Swanson v. Citibank, N.A.,* 614 F.3d 400, 404 (7th Cir. 2010).

Therefore, the Court grants Defendants' motion to dismiss Count I in regard to Wagner's October 23, 2012, memorandum, but denies Defendants' motion as the remainder of Plaintiff's allegations underlying his equal protection national origin discrimination claim.

## II.     First Amendment Claims — Counts II and III

## A.      Political Affiliation Claim — Count II

In Count II of his Complaint, Plaintiff alleges a violation of his First Amendment rights based on his political affiliation against Defendants Toll Authority, OIG, Wagner, and Representative Mayfield.  The First Amendment "forbids government officials to discharge or threaten to discharge public employees solely for not being supporters of the political party in power, unless party affiliation is an appropriate requirement for the position involved."  *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 64, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); *see also Moss v. Martin,* 614 F.3d 707, 710 (7th Cir. 2010) ("The First Amendment prohibits a state employer from terminating the employment of a worker on the basis of her political beliefs unless political affiliation is an appropriate requirement for the position.").  "To make out a prima facie case for this type of employment discrimination, a plaintiff must show two things: first, that the plaintiff's conduct was constitutionally protected, and second, that the protected conduct was a ... motivating factor in the employment decision."  *Hall v. Babb,* 389 F.3d 758, 762 (7th Cir. 2004); *see also Redd v. Nolan,* 663 F.3d 287, 294-95 (7th Cir. 2011).  "If a plaintiff can make the prima facie showing, the burden shifts to the defendant to demonstrate a legitimate, nonpolitical reason for the employment decision."  *Hall,* 389 F.3d at 762.

Plaintiff bases what he calls his "*Rutan* claim" on the following allegations.  First, the Toll Authority is a government actor obliged to follow *Rutan* and Plaintiff's employment position with the Toll Authority was a *Rutan*-covered position.  (Compl. ¶¶ 138-39.)  Further, Plaintiff alleges that Representative Mayfield knew that he did not reside within her district, specifically, Illinois House District 60, that he, unlike Maluska, was not her constituent, and that he reported her improper August 31, 2011 telephone call to two of his supervisors.  (*Id.* ¶ 141.)

Plaintiff also alleges that "Representative Mayfield was displeased that Caffarello would not protect Maluska by taking [an] employment action against Misek and Genella based upon her representations that they were harassing Maluska and was angry that Caffarello would not give Maluska special treatment or dole out discriminatory treatment to his co-workers so that she could 'take care of' her constituent, Maluska." (*Id.* ¶ 142.) In addition, Plaintiff alleges that "[a]s a result of his refusal to do Representative Mayfield's bidding, his report of her illegal or potentially illegal conduct to his superiors, his lack of political affiliation with her, and Maluska's political affiliation with her, Representative Mayfield intentionally targeted him for differential and unjust treatment." (*Id.* ¶ 144.)

In sum, Plaintiff bases his political affiliation claim on the fact that he was not Representative Mayfield's constituent and that her conduct was motivated by her constituent's needs. Plaintiff, however, fails to point to any legal authority that his status as a non-constituent would fall under the *Rutan* framework. *See Rutan*, 497 U.S. at 69 ("conditioning public employment on the provision of support for the favored political party 'unquestionably inhibits protected belief and association.'") (citation omitted). Indeed, the Supreme Court's decision in *Rutan*, its predecessors,[1] and its progeny involve political parties and political party affiliation. Citing its earlier decision, the *Rutan* Court reasoned that "political belief and association constitute the core of those activities protected by the First Amendment." *Id.* (citing *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality)). Also, the right to "non-affiliation" is protected in this context. *See Rutan,* 497 U.S. at 76 ("The First Amendment

---

[1] *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate.").

Nevertheless, because Plaintiff does not allege facts related to his association with a particular political party or his political beliefs, the Court looks to the general right to freedom of association. "The right to freedom of association—though not specifically mentioned in the Constitution—grows out of the freedom to speak, to worship, and to petition the government," and "[t]hose rights could not be protected unless a 'correlative freedom to engage in group effort toward those ends' is also guaranteed." *Klug v. Chicago Sch. Reform Bd. of Trs.,* 197 F.3d 853, 857 (7th Cir. 1999) (quoting *Roberts v. United States Jaycees,* 468 U.S. 609, 622, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984)). "In this circuit, a public employee is protected from adverse employment consequences based on the exercise of the right to freedom of association only when the associational conduct relates to a matter of public concern." *Klug,* 197 F.3d at 857; *see also Montgomery v. Stefaniak,* 410 F.3d 933, 937 (7th Cir. 2005) ("a plaintiff must first show that her associational activity relates to a matter of public concern").

Here, Plaintiff alleges that Maluska used his clout as Representative Mayfield's constituent, after which Representative Mayfield called Plaintiff telling him that she looks out for Maluska. According to Plaintiff, Representative Mayfield then told Plaintiff that Maluska complained about his fellow co-workers harassing him and that she wanted Plaintiff to put a stop to their harassment. Plaintiff contends that he told Representative Mayfield that it was inappropriate for her to contact him about disciplining Toll Authority employees. After Plaintiff moved Maluska to another shift, he alleges that Representative Mayfield provided a photograph

of him sleeping at work to the Toll Authority in a May 12, 2012, letter and that this letter triggered Warner's resulting investigation into Plaintiff's misconduct. Furthermore, Plaintiff alleges that he told two of his supervisors at the Toll Authority about Representative Mayfield's improper conduct. Based on these allegations, Plaintiff argues that his refusal to do Representative Mayfield's bidding, his refusal to favor her constituent at work, and his non-constituency resulted in Representative Mayfield, and subsequently, Wagner and the Toll Authority, targeting him.

Viewing Plaintiff's allegations and all reasonable inferences in his favor, he has not alleged that his associational conduct, namely, his refusal to do Representative Mayfield's bidding and his refusal to favor her constituent at work, was a matter of public concern because his refusal was not "associating to promote an idea" nor was his conduct meant to call public attention to any issues. *See Klug*, 197 F.3d at 858; *Cliff v. Board of School Comm'rs of City of Indianapolis, Ind.,* 42 F.3d 403, 411 (7th Cir. 1994). Instead, as he alleges, he told Representative Mayfield that it was inappropriate for her to contact him as Maluska's supervisor and then he directed her to talk to his supervisor, the Roadway Maintenance Manager. Under these allegations, the Court would be hard-pressed to conclude that the point of Plaintiff's associational conduct was to bring any alleged wrongdoing to light. *See Kristofek v. Village of Orland Hills,* 712 F.3d 979, 985 (7th Cir. 2013); *see also Linhart v. Glatfelter,* 771 F.2d 1004, 1010 (7th Cir. 1985) (self-interested statements not a matter of public concern). Therefore, the Court grants Defendants' motions to dismiss Plaintiff's First Amendment association claim as alleged in Count II with prejudice.

### B.    First Amendment Speech Claim — Count III

In Count III, Plaintiff alleges a First Amendment retaliation claim based on his right to speak on matters of public concern against Defendants Toll Authority, OIG, Wagner, and Representative Mayfield. Plaintiff bases this claim on the fact that he reported Representative Mayfield's inappropriate telephone call to his supervisors and his statement to Representative Mayfield that it was inappropriate for her to contact him about Maluska and other Toll Authority employees. In order for Plaintiff's speech to be protected, he must have been speaking as a citizen about a matter of public concern and not pursuant to his official responsibilities or duties. *See Garcetti v. Ceballos,* 547 U.S. 410, 421, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) ("when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"). As the *Garcetti* Court explained, public employees do not act as citizens when they conduct their daily professional activities. *See id.* at 422; *see also Chrzanowski v. Bianchi,* 725 F.3d 734, 738 (7th Cir. 2013).

Again, the Court turns to whether Plaintiff's speech was a matter of public concern, which is required to bring a First Amendment retaliation claim based on speech. *See Swetlik v. Crawford*, 738 F.3d 818 825 (7th Cir. 2013). As the Supreme Court explains, "[w]hen employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). "Whether an employee's speech implicates a matter of public concern is a question of law that 'must be determined by the content, form, and context of a given statement, as revealed by the whole

record.'" *Craig v. Rich Twp. High Sch. Dist. 227,* 736 F.3d 1110, 1115-16 (7th Cir. 2013)

(quoting *Connick*, 461 U.S. at 147-48). As the Seventh Circuit teaches:

> [T]he 'matter of public concern' inquiry does not require that speech relate to an
> issue of exceptional significance in order to be entitled to prima facie First
> Amendment protection.... [T]he speech need not address a topic of great societal
> importance, or even pique the interest of a large segment of the public, in order to
> be safeguarded by the First Amendment. Rather, an employee who "participat[es]
> in a public dialogue on matters of interest to the public" will "place his speech,
> prima facie, within the protection of the First Amendment."

*Craig,* 736 F.3d at 1116 (internal citations and parentheses omitted). In other words, a matter of

public concern "is a subject of legitimate news interest; that is, a subject of general interest and

of value and concern to the public." *San Diego v. Roe*, 543 U.S. 77, 83-84, 125 S.Ct. 521, 160

L.Ed.2d 410 (2004) (per curiam). Nonetheless, as the Supreme Court teaches — "not all speech

is of equal First Amendment importance, however, and where matters of purely private

significance are at issue, First Amendment protections are often less rigorous." *Snyder v.

Phelps*, 131 S.Ct. 1207, 1215 (2011) (citations and quotation marks omitted).

The Court thus turns to the content, form, and context of Plaintiff's August 31, 2011

statement to Representative Mayfield. The content and context of Plaintiff's statement was that

Representative Mayfield should not call him about disciplining his subordinates at the Toll

Authority who harassed Maluska, after which he told her that he takes his direction from

Roadway Maintenance Manager Zadel. As Plaintiff admits, Representative Mayfield's

statement involved an employment matter. (*See* Compl. ¶ 99.) Specifically, Plaintiff's statement

concerns who can tell him what to do as a supervisory employee of the Toll Authority and does

not reflect participation in the public dialogue regarding an elected official's misconduct, as his

argument suggests. *See Dishnow v. School Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996).

The fact that Plaintiff made this statement only to Representative Mayfield and later repeated the statement via e-mail to two Toll Authority supervisors further supports the conclusion that his August 31, 2011 statement was not "public dialogue." *See Snyder,* 131 S.Ct. at 1216 (citing *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 762, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985)). In short, Plaintiff's statement to Representative Mayfield was not a subject of general interest or of value to the public, *see Snyder,* 131 S.Ct. at 1216, and therefore, was not a matter of public concern.

Plaintiff also bases his First Amendment speech claim on the fact that he reported Representative Mayfield's telephone call to two of his supervisors via a September 1, 2011 e-mail. Even if the content of Representative Mayfield's telephone call to Plaintiff was a matter of public interest, "speech lacks the public concern element if it concerns a subject of public interest but the expression addresses only the personal effect upon the employee." *Phelan v. Cook Ctny.,* 463 F.3d 773, 791 (7th Cir. 2006) (citation omitted). It is not a reasonable inference based on Plaintiff's allegations that he intended to bring to light Representative Mayfield's alleged misconduct to provoke a public discussion when he e-mailed his supervisors about her telephone call. *See Milwaukee Deputy Sheriff's Ass'n v. Clarke,* 574 F.3d 370, 379 (7th Cir. 2009). Instead, Plaintiff's September 1, 2011 e-mail concerned the employment matter involving Maluska and the conflict between Maluska and his co-workers. (Compl. ¶ 30.) Therefore, Plaintiff's September 1, 2011, e-mail to two supervisors did not involve a matter of public concern. The Court grants Defendants' motion to dismiss Count III of the Complaint with prejudice.

## III.     Fourteenth Amendment Procedural Due Process Claim — Count IV

Next, Plaintiff alleges a procedural due process claim against Defendants Toll Authority and Wagner based on *Cleveand Board of Educ. v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). As the *Loudermill* Court instructs, an "essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.* at 542 (internal quotation marks and citation omitted). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Carmody v. Board of Trs. of Univ. of Ill.,* 747 F.3d 470, 474 (7th Cir. 2014) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (quotation marks omitted)). "[T]o determine whether due process requirements apply in the first place" courts "must look to see if the interest is within the Fourteenth Amendment's protection of liberty and property." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 570–71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). A protected property interest is a legitimate claim of entitlement, not defined by the Constitution, but "by existing rules or understandings that stem from an independent source such as state law." *Id.* at 577; *see also Santana v. Cook Cnty. Bd. of Review,* 679 F.3d 614, 621 (7th Cir. 2012).

Plaintiff first argues that he has a protected property interest in his employment. In Illinois, the presumption is that employment is at-will. *See Rujawitz v. Martin*. 561 F.3d 685, 688-89 (7th Cir. 2009). Nevertheless, in the employment context, a legitimate claim of entitlement and, thus, a protected property interest, arises in one of two ways: "(1) by an independent source such as state law securing certain benefits; or (2) by a clearly implied promise of continued employment." *Phelan v. City of Chicago*, 347 F.3d 679, 681 (7th Cir. 2003). Under the first way to establish a protected property interest, a "public employee who

17

can be fired only for good cause has a property interest in his or her job and may be deprived of that property interest only with due process of law." *Carmody,* 747 F.3d at 474.

Plaintiff points to the Toll Authority Policy and Procedures Manual, Chapter XI, DISCIPLINE & GENERAL PROVISIONS, as the state law source of his protected property interest in his employment. The particular provision upon which Plaintiff relies states that he has a right to procedural due process regarding the methods used to terminate his employment. This provision, however, merely sets forth the guidelines for the Toll Authority to administer discipline. *See Miyler v. Village of East Galesburg,* 512 F.3d 896, 898 (7th Cir. 2008) ("statute which merely provides procedures to be followed does not include a substantive right."); *see also Cain v. Larson,* 879 F.2d 1424, 1426 (7th Cir. 1989) ("[i]f a statute or regulation merely delimits what procedures must be followed before an employee is fired, then it does not contain the requisite substantive predicate" giving rise "to a constitutionally protected property interest."). Further, this disciplinary provision "does not contain language providing for the benefit of continued employment nor does it create a system of nondiscretionary rules governing the revocation or renewal of that benefit." *Kvapil v. Chippewa County, Wis.*, ___ F.3d ___, 2014 WL 2581258, at *6 (7th Cir. June 9, 2014). As such, this section of the Toll Authority's manual does not confer a protected property interest in Plaintiff's employment. Therefore, the Court grants Defendants' motion to dismiss Count IV of the Complaint with prejudice in regard to Plaintiff's property interest allegations.

Plaintiff also argues that Defendants deprived him of a liberty interest in the context of his employment. In particular, Plaintiff alleges that Defendants' conduct stigmatized him and he suffered a tangible loss of other employment opportunities. (Compl. ¶¶ 123-27.) It is well-

settled that "the interest protected is occupational liberty rather than reputation" otherwise, "defamation by a public official would be a federal tort, which no one believes." *Colaizzi v. Walker,* 812 F.2d 304, 307 (7th Cir. 1987). Therefore, the protected liberty interest is in a person's chosen occupation. *See id.* More specifically, the "concept of liberty protected by the due process clause has long included occupational liberty — 'the liberty to follow a trade, profession, or other calling.'" *Wroblewski v. City of Washburn,* 965 F.2d 452, 455 (7th Cir. 1992) (quoting *Lawson v. Sheriff of Tippecanoe Cnty.*, 725 F.2d 1136, 1138 (7th Cir. 1984)). "It is the liberty to pursue a calling or occupation, and not the right to a specific job, that is secured by the Fourteenth Amendment." *Wroblewski,* 965 F.2d at 455; *see also Roth,* 408 U.S. at 575 ("It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another."). As such, federal courts have recognized a protected liberty interest in the context of stigmatic or reputation injury in tandem with a change in legal status under the "stigma plus" test. *See Mann v. Vogel,* 707 F.3d 872, 878 (7th Cir. 2013); *Khan v. Bland,* 630 F.3d 519, 534 (7th Cir. 2010). Under the stigma plus test, the plaintiff must establish the inability to pursue the occupation of his choice, not a specific job. *See Mann,* 707 F.3d at 878; *Khan,* 630 F.3d at 535.

In his Complaint, Plaintiff alleges that he was stigmatized by the publically disclosed information concerning the circumstances surrounding his termination and that he thus suffered a tangible loss of other employment opportunities. Plaintiff, however, has not alleged nor argued that Defendants' conduct resulted in his inability to pursue the occupation of his choice. Alleging that he suffered a loss of "other employment opportunities" does not plausibly allege that it is "virtually impossible for [him] to find new employment in his chosen field." *Khan,* 630

F.3d at 535.  In fact, Plaintiff does not allege specific facts explaining what his chosen profession or occupation is.  Without more, Plaintiff has failed to include enough details about his liberty interest to state a claim of relief that is plausible on his face.  *See Twombly,* 550 U.S. at 570; *see also Adams v. City of Indianapolis,* 742 F.3d 720, 733 (7th Cir. 2014) (the amount of factual specificity required to state a plausible claim depends on the complexity of the claim).  The Court therefore grants Defendants' motion to dismiss Count IV without prejudice concerning Plaintiff's liberty interest allegations.  The Court grants Plaintiff leave to amend his liberty interest allegations in Count IV keeping in mind counsel's Rule 11 obligations.

## IV.     Conspiracy Claim — Count V

In Count V, Plaintiff alleges a conspiracy claim against all Defendants pursuant to 42 U.S.C. § 1983.  In their motions to dismiss, Defendants argue that because Plaintiff has failed to properly allege a violation of his constitutional rights, his conspiracy claim must necessarily fail. *See Sow v. Fortville Police Dept.,* 636 F.3d 293, 305 (7th Cir. 2011) ("absence of any underlying violation of Plaintiff's rights precludes the possibility of Plaintiff succeeding on a conspiracy claim").  Because Plaintiff has properly alleged his national origin discrimination claim in Count I and the Court is granting Plaintiff leave to re-allege his liberty interest allegations in Count IV against Defendants Toll Authority, OIG, and Wagner, the Toll Authority Defendants' argument is unavailing at this juncture.

Nonetheless, because the Court grants Defendant Representative Mayfield's motion to dismiss regarding the constitutional claims alleged against her in Counts II and III with prejudice, Plaintiff's § 1983 conspiracy claim against Representative Mayfield necessarily fails. *See Smith v. Gomez,* 550 F.3d 613, 617 (7th Cir. 2008) ("conspiracy is not an independent basis

of liability in § 1983 actions").

## V.     Tortious Interference Claim   — Count VI

In Count VI, Plaintiff alleges a common law claim of tortious interference with employment expectancy, also known as tortious interference with prospective economic advantage, against Wagner.  To ultimately establish this claim, Plaintiff must prove:  "(1) his reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship; and (4) damages to the plaintiff resulting from such interference."  *Fellhauer v. City of Geneva,* 142 Ill.2d 495, 511, 568 N.E.2d 870, 154 Ill.Dec. 649 (Ill. 1991); *see also Ali v. Shaw,* 481 F.3d 942, 944 (7th Cir. 2007).  "A plaintiff states a cause of action only if he alleges a business expectancy with a specific third party as well as action by the defendant directed towards that third party."  *Associated Underwriters v. McCarthy,* 356 Ill.App.3d 1010, 1020, 826 N.E.2d 1160, 292 Ill.Dec. 724 (1st Dist. 2005).

In his motion to dismiss, Wagner maintains that because Plaintiff has not alleged a business expectation with a third party along with Wagner's interference directed at that third party, Plaintiff's claim fails.  In response, Plaintiff argues that tortious interference with employment expectancy does not require an outside actor as demonstrated by *Mittelman v. Witous*, 135 Ill.2d 220, 552 N.E.2d 973, 142 Ill.Dec. 232 (1989), *abrogated on other grounds*, *Kuwik v. Starmark*, 156 Ill.2d 16, 619 N.E.2d 129 (1993).  In *Mittleman*, a supervising attorney in a law firm blamed an associate to cover-up his own negligence.  *See id.* at 250-51.  In finding that the plaintiff had sufficiently alleged a tortious interference claim, the Supreme Court of

Illinois concluded that corporate officers possess immunity against individual liability unless they act "solely for their own gain or solely for the purpose of harming plaintiff since such conduct is not taken to further the corporation's interest." *See id.* at 249. Accordingly, in the broadest sense, tortious interference by a supervisor is actionable if he acted on his own behalf and not in the company's interest. *See Maddie v. Siebel Sys., Inc.,* No. 04 C 3419, 2004 WL 2515827, at *4 (N.D. Ill. Nov. 5, 2004) (*Mittleman* "states that a defendant employee and a defendant company are not one in the same for purposes of the tortious interference analysis if the defendant employee acted on his own behalf and not in the company interest").

Plaintiff has not alleged that Wagner was acting solely for his own gain when he terminated Plaintiff's employment. Instead, as Plaintiff alleges, Wagner's duty was to investigate waste, inefficiencies, fraud, corruption, and the mismanagement in the day-to-day operations of the Toll Authority. Also, Plaintiff asserts that Wagner had the authority and responsibility for all employment decisions and policies concerning the terms and benefits of Plaintiff's employment. As such, Plaintiff has failed to state a claim upon which relief can be granted because Plaintiff admits in his allegations that Wagner was acting pursuant to his authority conferred by the Toll Authority when he terminated Plaintiff's employment. *See Atkins v. City of Chicago,* 631 F.3d 823, 832 (7th Cir. 2011) (a plaintiff "can plead himself out of court by pleading facts that show that he has no legal claim"). Therefore, the Court grants Defendants' motion to dismiss Count VI of the Complaint with prejudice.

## VI. Defamation and Invasion of Privacy Claims — Counts VII and Count VIII

In Count VII, Plaintiff brings a common law defamation claim and, in Count VIII, he alleges an invasion of privacy claim against Defendants Toll Authority, OIG, and Wagner.

Plaintiff bases his defamation and privacy claims on the Toll Authority's release of the January 2013 OIG Executive Memorandum, the March 2013 release and summary and activity report, and the release of an April 2013 OIG Executive Memorandum on the Toll Authority's website. Under Illinois law, "[d]efamation is the publication of a false statement that 'tends to harm a person's reputation to the extent that it lowers that person in the eyes of the community or deters others from associating with that person.'" *Lott v. Levitt*, 556 F.3d 564, 568 (7th Cir. 2009) (citation omitted). In addition, a claim for false light invasion of privacy has three elements under Illinois law, including defendants' actions place plaintiff in a false light before the public, the false light is highly offensive to a reasonable person, and defendants acted with malice, namely, with knowledge that the statements were false or with reckless disregard for whether the statements were true or false. *See Kolegas v. Heftel Broad. Corp.*, 154 Ill.2d 1, 17, 607 N.E.2d 201, 180 Ill.Dec. 307 (1992).

In their motion to dismiss, Defendants argue that they have an absolute privilege to release these reports on their website pursuant to 605 ILCS 10/8.5(e)(3). Indeed, 605 ILCS 10/8.5(e)(3) requires that the OIG make investigative summary reports available to the public via the Toll Authority's website and states in relevant part:

> Within 60 days after issuance of a final summary report that resulted in a suspension of at least 3 days or termination of employment, the Toll Highway Inspector General shall make the report available to the public by presenting the report to the Board of the Authority and by posting to the Authority's public website. The Toll Highway Inspector General shall redact information in the summary report that may reveal the identity of witnesses, complainants, or informants or if the Toll Highway Inspector General determines it is appropriate to protect the identity of a person before the report is made public.

In Illinois, "[a]bsolute privilege provides complete immunity from civil action, even when the statements at issue are made with malice." *Belluomini v. Zaryczny,* 7 N.E.3d 1, 7-8,

23

379 Ill.Dec. 575, 581-82 (1st Dist. 2014); *see also Morris v. Harvey Cycle & Camper, Inc.*, 392 Ill.App.3d 399, 404, 911 N.E.2d 1049, 331 Ill.Dec. 819, 824 (1st Dist. 2009). "The defense of absolute privilege is based on the notion that conduct which would otherwise be actionable is shielded from liability because the defendant is acting in furtherance of an interest of social importance, which is entitled to protection even at the expense of uncompensated harm to a plaintiff's reputation." *Belluomini,* 7 N.E.2d at 8. Because absolute privilege "provides complete immunity, the defense of absolute privilege is necessarily narrow and generally limited to situations which involve legislative, judicial, and quasi-judicial proceedings." *Id.*; *see also Anderson v. Beach*, 386 Ill.App.3d 246, 250, 897 N.E.2d 361, 325 Ill.Dec. 113 (1st Dist. 2008).

Pursuant to the Toll Highway Act, Defendants were required to publish findings of Plaintiff's termination on the Toll Authority's website. As Plaintiff alleges, he was terminated on February 20, 2013, and by law, within 60 days of his termination, Defendants were required to post the summary reports and memoranda. It is undisputed that on March 28, 2013, the Toll Authority Defendants placed on its website a summary activity report entitled "Illinois Tollway Inspector General Releases Summary Activity Report for Past Six Months," which stated that the Toll Authority had terminated the employment of a Toll Authority Maintenance Supervisor because he was found sleeping on the job and had intimidated employees. Also on March 28, 2013, the Toll Authority Defendants placed on the website a similar summary activity report stating that OIG initiated an investigation of a Maintenance Supervisor on March 27, 2012, "following receipt of information from an elected official, regarding allegations of the Supervisor sleeping on the job and intimidating employees." Further, on April 19, 2013, the Toll Authority Defendants published redacted copies of the January 30, 2013 OIG Executive

Memorandum and Plaintiff's February 11, 2013 response on the Toll Authority's website. Because Defendants' conduct was required by state statute, absolute privilege applies to Plaintiff's claims against Defendants as alleged in Counts VII and VIII of the Complaint.

Plaintiff's argument that the summary reports and memoranda were based on false statements is unavailing because "[a]n absolute privilege cannot be overcome by a showing of improper motivation or knowledge of falsity." *Geick v. Kay,* 236 Ill.App.3d 868, 875, 603 N.E.2d 121, 177 Ill.Dec. 340 (2d Dist. 1992); *see also Belluomini,* 7 N.E.3d at 7-8. The Court therefore grants Defendants' motion to dismiss Counts VII and VIII with prejudice.

## VII. Whistleblower Retaliation Claim — Count IX

Last, Plaintiff alleges a whistleblower retaliation claim against Representative Mayfield based on the Illinois State Officials and Employees Ethics Act, 5 ILCS 430/1, *et seq.*, ("Ethics Act"), which states in relevant part:

> An officer, a member, a State employee, or a State agency shall not take any *retaliatory action* against a State employee because the State employee does any of the following:
>
> > (1) Discloses or threatens to disclose to a supervisor or to a public body an activity, policy, or practice of any officer, member, State agency, or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation.

5 ILCS 430/15-10(1) (emphasis added); *see Hosick v. Chicago State Univ. Bd. of Trs.,* 924 F.Supp.2d 956, 974 (N.D. Ill. 2013) ("The Ethics Act prohibits retaliation based on a state employee's disclosure of an activity, policy, or practice that the employee reasonably believes violates a law, rule, or regulation."). "'Retaliatory action' means the reprimand, discharge, suspension, demotion, denial of promotion or transfer, or change in the terms or conditions of employment of any State employee, that is taken in retaliation for a State employee's

involvement in protected activity, as set forth in Section 15-10."  5 ILCS 430/15-5.

In her motion to dismiss, Representative Mayfield argues that because she was not Plaintiff's employer, she could not have taken any of the retaliatory actions enumerated in 5 ILCS 430/15-5.  Plaintiff, on the other hand, maintains that Representative Mayfield's conduct was a causal factor in his termination from the Toll Authority.  In particular, Plaintiff argues that Representative Mayfield targeted him and influenced Wagner's decision to terminate his employment — although it is undisputed that Wagner was the final decision-maker under the circumstances.  (*See* Compl. ¶ 9.)

Because there is an absence of Illinois case law interpreting these sections of the Ethics Act, the Court turns to Title VII retaliation cases for guidance.  *See Hosick,* 924 F.Supp.2d at 974.  Under Seventh Circuit law, in order to bring a Title VII retaliation claim against Representative Mayfield, Plaintiff must have had an employment relationship with her.  *See Small v. Chao,* 398 F.3d 894, 897 (7th Cir. 2005).  Similarly, a plaintiff cannot maintain an Illinois common law retaliatory discharge claim against a non-employer.  *See Buckner v. Atlantic Plant Maint., Inc.,* 182 Ill.2d 12, 22, 694 N.E.2d 565, 230 Ill.Dec. 596 (Ill. 1998) ("the only proper defendant in a retaliatory discharge action is the plaintiff's former employer.").  Viewing the allegations in Plaintiff's favor, he has not alleged an employment relationship with Representative Mayfield and it is undisputed that the Toll Authority was his employer.  The Court therefore grants Representative Mayfield's motion to dismiss Count IX with prejudice.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Defendants' motions to

dismiss.  The Court dismisses Representative Mayfield as a Defendant from this lawsuit.

Dated: July 17, 2014

**ENTERED**

_____

**AMY J. ST EVE**
**United States District Court Judge**